UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

AMBER KEUMURIAN,

              Plaintiff,

           v.

MASSACHUSETTS BOARD OF HIGHER
EDUCATION, DELTA MANAGEMENT
ASSOCIATES, INC., FINANCIAL ASSET
MANAGEMENT SYSTEMS, INC., PREMIER
CREDIT OF NORTH AMERICA, INC., AND
COLLECTO INC., d/b/a EOS CCA,

             Defendants.

CIVIL ACTION
NO. 5:16-CV-170

## MEMORANDUM IN SUPPORT OF THE MASSACHUSETTS BOARD OF HIGHER EDUCATION'S MOTION TO DISMISS

      The Massachusetts Board of Higher Education (MBHE) respectfully moves to dismiss the complaint as it pertains to MBHE.  Plaintiff Amber Keumurian sued MBHE and four debt collection companies for allegedly violating state and federal law while attempting to collect her student loan debt.  The complaint must be dismissed against MBHE, however, because a) MBHE has no contact with the state of North Carolina sufficient to establish personal jurisdiction and b) MBHE is a state agency and therefore immune from suit under the doctrine of sovereign immunity.  As a result, this Court has no personal or subject-matter jurisdiction over MBHE and the complaint against MBHE must be dismissed under Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6).

1

# I.    BACKGROUND

## 1.    The Massachusetts Board of Higher Education and the No Interest Loan Program

The Massachusetts Board of Higher Education is a statutorily-created state agency responsible for coordinating the Commonwealth of Massachusetts's system of public higher education.  *See* M.G.L. c. 15A §§ 1, 4; Affidavit of Clantha McCurdy ("McCurdy Aff.") ¶ 2.[1] MBHE oversees the Commonwealth's network of college and universities.  McCurdy Aff. ¶ 3-5.  As part of this responsibility, MBHE allocates certain student funding, including grants, scholarships, tuition waivers, and a loan program called the Massachusetts No Interest Loan Program ("NIL Program") to participating colleges in Massachusetts.  *Id.* ¶ 7.

The NIL Program provides interest-free loans through a revolving loan payment system to qualifying students attending Massachusetts colleges.  *Id.* ¶ 8-9.  The program utilizes a central fund called the No Interest Loan Trust Account, which replenishes continually as individual borrowers pay back their loans, allowing new loans to be issued to new borrowers.  *Id.* ¶ 8.  Both public and private schools participate in the NIL Program.  *Id.* ¶ 9.

To collect on loans issued under the NIL Program, MBHE contracts with a billing servicer.  *Id.* ¶ 10.  MBHE is not directly involved with the collection process itself.  *Id.* ¶ 11. Instead, the billing servicer handles loan collections, repayment, invoices, calls to borrowers, and other logistics.  *Id.* ¶ 10.  If an account becomes overdue, the billing servicer sends past-due notices at 30, 60, 90 and 120 days past due.  *Id.*  Once an account becomes 120 days past

---

[1] Because this Motion to Dismiss is based in part on jurisdictional grounds, the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  Lambeth v. Carolina Pers. Co., 358 F. Supp. 2d 484, 486 (M.D.N.C. 2005).

due, the billing servicer sends it to one of five collection agencies under contract with the Commonwealth, and these agencies handle further collection. *See id.*

MBHE has no offices or employees in North Carolina, does not advertise in North Carolina, and has no business in North Carolina. *Id.* ¶ 14.

### 2. Keumurian's Involvement with the MBHE[2]

Plaintiff Amber Keumurian ("Keumurian") is a former student at Fitchburg State College (now Fitchburg State University) in Massachusetts. Complaint ¶ 40. In 2002, she borrowed $3,500 at 0% interest from the Commonwealth of Massachusetts to help finance her education.[3] *Id.* ¶ 37. After graduating in May 2003, she made an initial $500 payment on her loan but failed to make further payments. *See id.* ¶ 41-48. In the months that followed, MBHE sent Keumurian's loan to collections. *See id*.

Three years later, in August 2006, Keumurian received word from ACS Education Services, a private collection agency not named in this suit, that she still owed $3,000 at a 0% interest rate. *Id.* ¶ 42. She filed a "Deferment Request Form" with ACS requesting deferral of her loan payments until 2009, although it is not clear whether her request was granted. *See id.* ¶ 43. At some point after that, Keumurian consolidated some of her student loans, but failed to consolidate the MBHE loan with other loans. *Id.* ¶ 45.

---

[2] The facts are drawn from the amended complaint and exhibits attached to it. The MBHE does not admit these allegations, but acknowledges that the court accepts them as true for the purposes of this motion to dismiss, and presents them accordingly. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] The McCurdy affidavit states that Keumurian borrowed $1,000 for the 2001-2002 school year, and $2,000 for the 2002-2003 school year, presenting a slight discrepancy between the affidavit and Keumurian's amended complaint. *See* McCurdy Aff. ¶ 12. Because this is a motion to dismiss and the distinction is not relevant for the purposes of this motion, however, MBHE recites Keumurian's version of these details.

In January 2010, Keumurian accessed her credit report and realized that the MBHE loan had not been consolidated and was delinquent. *Id.* ¶ 47. Five months after that, in June 2010, she contacted MBHE and learned that MBHE had sent the loan to Windham Professionals, a company also not named in this suit, for collection. *Id.* ¶ 48. Keumurian contacted Windham and sent the company a check for $10.00 "in an attempt to locate the party to whom she should make payments," but Windham told her that it was no longer servicing her account and forwarded the check to MBHE. *Id.* ¶ 50-51.

The next month, July 2010, MBHE sent Keumurian a letter indicating that her account had been placed with defendant Collection Company of America (CCA), now known as EOS CCA, or Collecto, Inc. *Id.* ¶ 10, 52. Keumurian called CCA about making payments, but CCA demanded full repayment of the loan, refused to take a payment by check, and threatened to garnish her wages. *Id.* ¶ 55-56. The next month, Keumurian's attorney contacted CCA and explained that the loan carried no interest and it was illogical to expect Keumurian to repay it in full all at once. *Id.* ¶ 58. He then arranged with CCA to have Keumurian make partial payments by check on a monthly basis. *Id.*

Over the next few months, from July 2010 to January 2011, Keumurian made seven payments of $150 each to CCA. *Id.* ¶ 60-73. CCA cashed each of these checks. *Id.* Then, in March 2011, Keumurian made two $150 payments that CCA apparently declined to cash. *Id.* ¶ 74-76. In all, Keumurian made nine payments to CCA totaling $1,350, but CCA cashed only seven of these payments, for a total of $1,050. *Id.* ¶ 77-78. Keumurian then contacted CCA and asked to pay the outstanding balance in full. *Id.* ¶ 80. In May 2011, CCA sent Keumurian an invoice for $1,968.00, and two months later, in August 2011, Keumurian mailed CCA a check for that amount. *Id.* ¶ 83-84. CCA cashed her check. *Id.* ¶ 85.

4

After making what she thought was her final payment, Keumurian nonetheless continued to receive letters and calls from various debt collection companies.  *Id.* ¶ 91-100.  From October 2012 to March 2013, she received a number of "debt collection calls" from individuals working for a company named Delta Management Associates (DMA), a named defendant.  *Id.* ¶ 11, 91-100.  Some of these calls were made by real people; others used "automated telephonic dialing equipment."  *Id.* ¶ 90.   After receiving several voicemails from DMA, Keumurian called the company and asked to speak with "Wanda," the person who had left a voicemail with her.  *Id.* ¶ 93-95.  A DMA representative told her that they did not know who "Wanda" was.  *Id.* ¶ 95.  When Keumurian explained that she believed she did not owe any further debt, the DMA representative told her that DMA "did not know who [Keumurian] was and that she would have to wait until DMA called her back."  *Id.* ¶ 96.

In March 2013, Keumurian stopped getting calls from DMA and started getting calls from a company called Financial Asset Management Systems (FAMS), also a named defendant.  *Id.* ¶ 103-107.  She received two voicemails from FAMS, which also used automated telephonic dialing equipment.  *Id.* ¶ 104-105.  Then, nearly a year later, in February 2014, FAMS sent Keumurian a "debt collection letter."  *Id.* ¶ 108.  Soon after that, in March 2014, Keumurian received two "debt collection letters" from a different company named Premiere Credit of North America (PCNA), also a named defendant.  *Id.* ¶ 111-112.  Keumurian received no calls or letters from MBHE, however.  *See generally id.*

### 3.  This Lawsuit

In 2016, Keumurian filed suit in this Court against MBHE and the four companies, bringing four claims: 1) a claim under the North Carolina Collection Agency Act, N.C. Gen. Stat. § 58-70-90, *et. seq.*; 2) a claim under the North Carolina Debt Collection Act, N.C. Gen. Stat. § 75-50, *et. seq.*; 3) a claim under the Telephone Consumer Protection Act, 47 U.S.C. §

5

227, *et. seq.*; and 4) a claim for civil conspiracy. *Id.* ¶ 113-174. In support of these claims, Keumurian alleged that some or all of the entities named above – MBHE, CCA, DMA, or FAMS – intentionally sold or transferred her debt despite knowing that it had been paid in full, in violation of various debt collection laws. *Id.* ¶ 86, 101, 109. She argues that the actions of "each successive debt collector . . . were in bad faith," *id.* ¶ 118, and that "All Defendants have repeatedly attempted to collect a debt which they all knew was not owed" by Keumurian, thereby violating the law. *Id.* ¶ 122. MBHE now moves to dismiss the complaint as it pertains it MBHE.

## II.   ARGUMENT

### A.  THIS COURT LACKS PERSONAL JURISDICTION OVER MBHE

To assert personal jurisdiction over MBHE, Keumurian must establish two conditions. First, she must show that an "exercise of jurisdiction [is] authorized by [North Carolina's] long-arm statute," and second, that "the exercise of personal jurisdiction . . . comport[s] with Fourteenth Amendment due process requirements." *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). North Carolina's long-arm statute "is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause," see *Century Data Systems, Inc. v. McDonald*, 428 S.E.2d 190, 191 (1993), and thus "the two-prong test merges into the single question whether [Keumurian] has made a prima facie showing that [MBHE] had sufficient contacts with North Carolina to satisfy constitutional due process." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 559 (4th Cir. 2014). Keumurian can make no such showing here.

The Due Process Clause of the Fourteenth Amendment "protects the defendant's right not to be coerced except by lawful judicial power." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 877 (2011). Thus, "[a]s a general rule, the exercise of judicial power is not lawful unless the defendant purposefully avails itself of the privilege of conducting activities within the forum

State, thus invoking the benefits and protections of its laws." *Id.* (internal quotations omitted). These limitations are "designed to ensure that the defendant is not haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

To determine whether a court may lawfully exercise judicial power over a defendant under the Due Process Clause, courts in this circuit employ a three-part test. *Universal Leather*, 773 F.3d at 559. Under that test, courts consider "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 397 (4th Cir. 2003) (quotations omitted).[4] Courts proceed through this analysis step-by-step: "[i]f, and only if, we find that the plaintiff has satisfied this first prong of the test for specific jurisdiction need we move on to a consideration of prongs two and three." *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009). Keumurian must therefore fulfill all three prongs to lawfully establish specific jurisdiction over MBHE. *See id.*; *see also Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989) (noting that the plaintiff bears the burden of establishing personal jurisdiction). But she will be

---

[4] There are two types of personal jurisdiction: *specific* personal jurisdiction and *general* personal jurisdiction. *See Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 559 (4th Cir. 2014). Specific jurisdiction is satisfied "if the defendant's qualifying contacts with the forum state also constitute the basis for the suit," whereas general jurisdiction requires a "more demanding showing of continuous and systematic activities in the forum state." *Id.* Keumurian does not allege that MBHE engaged in "continuous and systematic activities" sufficient to establish general personal jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). As such, the inquiry here must focus solely on specific jurisdiction – i.e., "on the conduct giving rise to the suit." *Cf. Carefirst*, 334 F.3d 390, 397 ("Because there is, in this case, no suggestion that [the defendant] engaged in continuous and systematic activities within [the forum state of] Maryland, our inquiry must focus on the conduct giving rise to the suit.").

unable to do so because MBHE never purposefully availed itself of any privileges or benefits of North Carolina and generally has no contacts with the state.

### 1. MBHE Never Purposefully Availed Itself of North Carolina's Privileges, Benefits, or Protections.

Keumurian must first show that MBHE purposefully availed itself of the "privilege of conducting business in a forum state." *Universal Leather*, 773 F.3d at 559. "This analysis is flexible, and depends on a number of factors that courts consider on a case-by-case basis." *Id.* at 560 (internal quotations omitted). For example, at least in the business context, those factors may include, among other things:

> (1) whether the defendant maintains offices or agents in the forum state; (2) whether the defendant owns property in the forum state; (3) whether the defendant reached into the forum state to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the forum state; (5) whether the parties contractually agreed that the law of the forum state would govern disputes; (6) whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; (7) the nature, quality and extent of the parties' communications about the business being transacted; and (8) whether the performance of contractual duties was to occur within the forum.

*Id.* at 560-61 (quoting *Consulting Engineers*, 561 F.3d at 278).

None of these factors support a finding of purposeful availment here. This dispute arose out of a loan issued by a Massachusetts agency to a then-Massachusetts resident to support her attendance at a Massachusetts state college. MBHE has no offices, employees, or ongoing business of any kind in North Carolina. McCurdy Aff. ¶ 14. It does not advertise in North Carolina. *Id.* MBHE does not "reach into" North Carolina to issue loans or conduct business; it only lends to Massachusetts students attending colleges and universities in Massachusetts. *See id.* ¶ 7-9. MBHE's mission and goals focus quite naturally on education in Massachusetts, not other states. *Id.* ¶ 2-6.

In this case, any connection between MBHE and North Carolina is entirely coincidental. Keumurian took out a loan to complete her education at a college in Massachusetts. She graduated from that college and, at some point after graduation, moved to North Carolina for reasons having nothing to do with MBHE. MBHE issued the loan before Keumurian moved in order to finance her education in Massachusetts, not elsewhere. The fact that Keumurian moved to North Carolina has nothing to do with MBHE's conduct in this case.

The Fourth Circuit has emphasized that "random, fortuitous, or attenuated" contacts such as these do not lead to a finding of purposeful availment. *CFA Inst.*, 551 F.3d at 293 (quoting *Burger King*, 471 U.S. at 475). In *Foster v. Arletty 3 Sarl*, the Court found no purposeful availment where the French defendants "merely contacted a French citizen residing in South Carolina for assistance in securing licenses" but otherwise maintained "no offices, agents, or employees in South Carolina and [did] not advertise in South Carolina." 278 F.3d 409, 415 (4th Cir. 2002). Similarly, in *Consulting Engineers*, there was no purposeful availment where a defendant company had no offices, employees, property, "on-going business activity," or any "in-person contact" with the plaintiff in the forum state." 561 F.3d at 279–80. *Cf. Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 302 (4th Cir. 2012) (finding purposeful availment where the foreign defendant met with the plaintiff in Virginia to initiate the business relationship and subsequently employed a Virginia resident while conducting ongoing communication and business with contacts in Virginia); *CFA Inst.*, 551 F.3d at 295 (finding purposeful availment where a company initiated contact with a Virginia organization, engaged in "ongoing business transactions," and "repeatedly reached into Virginia to transact business" with the organization); *Nolan*, 259 F.3d at 217 (finding purposeful availment where the defendant "deliberately entered a collaborative enterprise with [a partner in the forum state]" with full

9

knowledge that that partner would upload potentially tortious information to the internet from his office in the forum state).

If anything, this case has even more attenuated contacts than those in *Foster* or *Consulting Engineers*, which were insufficient to establish purposeful availment. In *Foster*, the foreign defendant took the active step of contacting a business partner in the forum state to assist with securing a license and thereafter had "fleeting communication by telephone and fax," *Foster*, 278 F.3d at 415; in *Consulting Engineers*, the foreign defendant reached out to negotiate a contract with an in-state plaintiff that was ultimately performed elsewhere. *See Consulting Engineers*, 561 F.3d at 279–80. In both cases, the court held that the companies' contacting the in-forum business partner was insufficient to support an exercise of personal jurisdiction.

Here, MBHE did not take even the modest step of initiating contact with anyone in North Carolina. Indeed, the complaint makes only two references to direct contact between MBHE and Keumurian after the original execution of the loan. According to Keumurian, in June 2010, Keumurian contacted MBHE, presumably by phone, to ascertain the status of her loan. Compl. ¶ 48. Then, a month later, MBHE "replied to Plaintiff in a letter" informing her that her account had been placed with CCA. *Id.* ¶ 52. Through this phrasing, Keumurian concedes that MBHE "replied" to *her request* for information, but did not initiate the contact of its own accord. *See id.* Therefore, at most, MBHE had only "casual" or "isolated" contacts with Keumurian in North Carolina, insufficient to trigger a finding of purposeful availment. *See CFA Inst.*, 551 F.3d at 293.

To be sure, various debt collection companies contacted Keumurian while she was living in North Carolina. Yet MBHE itself made no phone calls to Keumurian, as Keumurian concedes in her complaint. *See generally* Compl. ¶ 37-112. Yes, Keumurian argues under her TCPA Count that "Defendants" – none specifically named – called Plaintiff's cell phone by means of an

automated dialing system. Compl. ¶ 164. And elsewhere, she alleges that "at all times relevant to this action, MBHE was engaged in commerce in North Carolina." *Id.* ¶ 14. But these statements are unaccompanied by any specific facts; she does not include details on how, when, or where MBHE allegedly called her with an automated dialing system, despite providing such details as to other defendants; and she never explains what "commerce," if any, MBHE was "engaged in," or how that "commerce" connects to North Carolina. *See id.* As a result, these conclusory statements are nothing more than "threadbare recitals" insufficient to survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Keumurian therefore cannot establish that MBHE purposefully availed itself of North Carolina's benefits or protections, and this Court should end the inquiry and dismiss the complaint against MBHE for lack of personal jurisdiction.

## 2. Keumurian's Claims Do Not Arise Out of Activities Directed at North Carolina.

Even if she were able to establish purposeful availment, Keumurian cannot prove the second prong of the test: that her claims against MBHE arose out of activities that MBHE directed at North Carolina. The Fourth Circuit has noted that "[t]he analysis here is generally not complicated . . . Where activity in the forum state is the genesis of the dispute, this prong is easily satisfied." *Tire Eng'g*, 682 F.3d at 303 (internal marks and quotations omitted). Additionally, "substantial correspondence and collaboration between the parties, one of which is based in the forum state," may also show that the claims arise out of activities directed at the forum state. *Id.*

In this case, the origin of Keumurian's dispute with MBHE was in Massachusetts, not North Carolina. In 2002, MBHE issued Keumurian a loan in Massachusetts. This was the "genesis of the dispute" – the issuance of a loan that later became delinquent, which sparked the

11

involvement of debt collection companies seeking to collect on the loan. The loan was issued long before Keumurian moved to North Carolina or contemplated filing a lawsuit. Moreover, MBHE and Keumurian had no "substantial correspondence or collaboration" at all, let alone correspondence or collaboration directed at North Carolina. For seven years after Keumurian took out a loan from MBHE, the two parties had no contact. Then, after a brief phone call and letter in 2010, MBHE and Keumurian again lost contact, as MBHE referred Keumurian's account to a debt collector and Keumurian began communicating directly with private companies. Thus, the sum of the two parties' "collaboration" and "correspondence" appears to be one phone call and one letter, sent seven years after the issuance of the loan and six years prior to the filing of this complaint. Those interactions cannot be labeled "substantial," and as a result Keumurian cannot satisfy this prong of the three-part test. *Cf. id.*

### 3. Exercising Personal Jurisdiction Over MBHE Is Not Constitutionally Reasonable.

Finally, exercising personal jurisdiction over MBHE would not be "constitutionally reasonable." Although "constitutional reasonableness is a somewhat nebulous concept," *Nolan*, 259 F.3d at 217, in general "such an analysis ensures that litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." *CFA Inst.*, 551 F.3d at 296. To assist the inquiry, the Fourth Circuit has sometimes employed a three-factor balancing test examining "the burden on the defendant, the forum State's interest in adjudicating the dispute, [and] the plaintiff's interest in obtaining convenient and effective relief."[5] *Nolan*, 259 F.3d at 217; *see also Base Metal Trading, Ltd. v. OJSC "Novokuznetsky*

---

[5] *Nolan* set forth two more factors – "the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies," 259 F.3d at 217 – but subsequent cases have analyzed only the first three listed above. *See, e.g., CFA Inst.*, 551 F.3d at 296; *Base Metal Trading*, 283 F.3d at 213.

*Aluminum Factory"*, 283 F.3d 208, 213 (4th Cir. 2002); *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 946 (4th Cir. 1994).

Here, litigating this case in North Carolina would place a significant burden on MBHE. In accordance with state law, Mass. Gen. Laws c. 12 § 3, MBHE is represented by the Massachusetts Attorney General. The Attorney General has no attorneys licensed to practice in North Carolina. Neither MBHE nor the Attorney General has offices or personnel in North Carolina. As a result, the costs and inconvenience of litigating a dispute in a far-away forum – including travel and lodging, not to mention the burden of multiple attorneys familiarizing themselves with the case law and procedures of a foreign circuit – would be substantial.

Next, it is not clear that North Carolina has a significant interest in adjudicating a dispute that is, at its core, about the Commonwealth of Massachusetts' loan to a former Massachusetts resident attending a Massachusetts state college. Keumurian might argue that North Carolina has an interest in protecting its citizens from "robo-calling" and other debt collection practices, but there is no allegation that MBHE itself, unlike the private co-defendants, made any calls at all – automated or no. The fact that the loan initiated with MBHE, later was referred to private collection companies who allegedly contacted Keumurian who happened to be living in North Carolina is too tenuous a link to somehow heighten North Carolina's interest in adjudicating the dispute in North Carolina, rather than in Massachusetts.

Finally, Keumurian naturally maintains an "interest in obtaining convenient and effective relief," but the complaint does not make clear how that interest would be served by adjudicating this case in North Carolina. Keumurian's complaint makes no reference to Keumurian's connection to North Carolina; it does not even explicitly state that she lives in North Carolina (although presumably she does since she has filed her lawsuit there). The complaint, however, does indicate that Keumurian had strong ties to Massachusetts in that she lived in Massachusetts

13

and attended a Massachusetts state college.  Keumurian has therefore not shown how, beyond the obvious desire to pursue her suit in the most convenient way possible, her interest in convenience would outweigh the substantial burden placed on MBHE to litigate a case in a distant forum to which it has no connection.  Accordingly, the balancing factors favor MBHE and an exercise of personal jurisdiction would not be constitutionally reasonable.

## B.  KEUMURIAN'S SUIT IS BARRED BY SOVEREIGN IMMUNITY

Keumurian's suit is also barred by the doctrine of sovereign immunity.  "[T]he States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today."  *Alden v. Maine*, 527 U.S. 706, 713 (1999).  Sovereign immunity is sometimes referred to as "Eleventh Amendment immunity" because the Eleventh Amendment explicitly bars suits "against one of the United States by citizens of another state."[6]  U.S. Const., Amend. XI.  But the Supreme Court has emphasized that the doctrine of sovereign immunity runs deeper than the Eleventh Amendment's text.  In fact, a state's sovereign immunity "derives . . . from the structure of the original Constitution itself," see *Alden*, 527 U.S. at 728, and protects "the dignity and respect afforded a State" as an independent sovereign.  *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268 (1997).  As such, "[t]he ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."  *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001).  *See also Ex parte Ayers*, 123 U.S. 443, 505 (1887) ("The very object and

---

[6] The full text of the Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."  U.S. Const., Amend. XI.

Case 5:16-cv-00170-RLV-DSC   Document 32   Filed 02/24/17   Page 14 of 22

purpose of the [E]leventh [A]mendment were to prevent the indignity of subjecting a state to the coercive process of judicial tribunals at the instance of private parties.").

That guarantee also extends to a state's agencies and departments. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993) ("Absent waiver, neither a State *nor agencies acting under its control* may be subject to suit in federal court.") (emphasis added) (internal quotations omitted); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State *or one of its agencies or departments* is named as the defendant is proscribed by the Eleventh Amendment.") (emphasis added).

To determine whether a defendant is a state agency, this circuit employs the "arm-of-the-state" analysis.[7] *See U.S. ex rel. Oberg v. Kentucky Higher Educ. Student Loan Corp.*, 681 F.3d 575, 580 (4th Cir. 2012). Under that test, courts must weigh four "nonexclusive" factors to determine whether a defendant is an arm of the state:

> (1) whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State;
>
> (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;
>
> (3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and
>
> (4) how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

---

[7] At least four other circuits also use this test, although the factors may differ slightly. *See, e.g., United States v. Univ. of Massachusetts, Worcester*, 812 F.3d 35, 40 (1st Cir. 2016); *Stoner v. Santa Clara Cnty. Office of Educ.*, 502 F.3d 1116, 1121–22 (9th Cir. 2007); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 718 (10th Cir. 2006); *United States ex rel. Adrian v. Regents of Univ. of Cal.*, 363 F.3d 398, 401–02 (5th Cir. 2004).

*Id.* (citing *S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 303 (4th Cir. 2008)).

Applying these factors here, MBHE is unquestionably an arm of the Commonwealth of Massachusetts. A recent decision by the First Circuit, *United States v. Univ. of Massachusetts, Worcester*, 812 F.3d 35, 40 (1st Cir. 2016), is directly on point. In that case, the First Circuit applied a similar "arm-of-the-state" test to conclude that the University of Massachusetts Medical School in Worcester, a public institution of higher education overseen by MBHE, is an arm of the state. *Id.* at 42. It noted that "[a]s a general matter, public universities usually are considered arms of the state," largely because of "[t]he distinctive, public-oriented role that a state university typically plays in its state's higher education landscape" and the statutory framework that mandates close state supervision of the school's budget, among other things. *See id.* at 40-41 (citing *Irizarry–Mora v. Univ. of P.R.*, 647 F.3d 9, 14 (1st Cir. 2011)). The Court further made clear that MBHE, which supervises universities that are themselves arms of the state, must also be an arm of the state:

> The board of higher education is itself a creature of state statute. *See* Mass. Gen. Laws ch. 15A, § 1. Ten of the board's thirteen members are appointed by the governor (including, ex officio, the secretary of education or her designee), *see id.* § 4, and the board exercises a range of supervisory powers over the University, *see id.* § 9. The board is also charged with making proposals for approval by the secretary of education or the legislature relating to public higher education. *See id.*

*Id.* at 41, n.3. In addition, MBHE is funded by the state treasury and any judgment against MBHE would be paid out of the state treasury. *See* McCurdy Aff. ¶ 6. Given all these factors, MBHE must be considered an arm of the Commonwealth of Massachusetts. And as an arm of the state, MBHE is immune from suit in federal court. *See Pennhurst*, 465 U.S. at 100–01.

Keumurian might claim that MBHE's sovereign immunity has been waived or abrogated, but these arguments fail because she can point to no state or federal statute that "unequivocally

express[es]" MBHE's consent to be sued or Congress's intent to abrogate MBHE's immunity. *Pennhurst*, 465 U.S. at 99. State entities may waive their sovereign immunity, but only if they make a "clear declaration" in "the text of the relevant statute." *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 680 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). Indeed, the Supreme Court has emphasized that it "will find waiver only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (rejecting also the doctrine of "constructive consent") (internal quotations and marks omitted). Waivers of sovereign immunity "will be strictly construed, in terms of its scope, in favor of the sovereign," *Lane v. Peña,* 518 U.S. 187, 192 (1996), and "cannot be implied." *Sossamon*, 563 U.S. at 284.

Here, Keumurian cannot point to any statute authorizing suit against MBHE in federal court. MBHE's enabling statute contains no such language; indeed, the statute makes no reference at all to lawsuits filed against the board. *See* M.G.L. c. 15A § 1, 4. The statute has therefore made no "clear declaration" that MBHE waives its sovereign immunity as an arm of the Commonwealth of Massachusetts, and MBHE's immunity stands.

Similarly, Keumurian cannot show that Congress intended to abrogate sovereign immunity when it enacted the Telephone Consumer Protection Act (TCPA).[8] To determine whether Congress has abrogated the States' sovereign immunity, courts must ask two questions: "first, whether Congress has unequivocally expressed its intent to abrogate the immunity; and second, whether Congress has acted pursuant to a valid exercise of power." *Seminole Tribe of*

---

[8] The abrogation analysis applies only to Keumurian's federal claim under the TCPA, and not her state law claims, because only Congress may abrogate a state's sovereign immunity. *See Green v. Mansour,* 474 U.S. 64, 68 (1985) (noting that *Congress*, not a state, must "unequivocally express[] its intent to abrogate the immunity").

*Florida v. Florida*, 517 U.S. 44, 55 (1996) (citing *Green v. Mansour,* 474 U.S. 64, 68 (1985)) (internal marks and quotations omitted).  This is a "stringent test."  *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989).  "Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement," *Seminole Tribe*, 517 U.S. at 55, and must be "unmistakably clear from the language of the statute."  *Dellmuth*, 491 U.S. at 227-28.  "A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment."  *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 246 (1985).

The TCPA contains no such unequivocal language.  Congress enacted the TCPA in 1991 to outlaw telemarketers from using automated telephone dialing systems to call consumers – in other words, "robo-calling."  *See* 47 U.S.C. § 227; *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012) (noting that Congress enacted the TCPA in response to "[v]oluminous consumer complaints about abuses of telephone technology").  The Act generally authorizes two types of lawsuits to enforce this ban on robo-calling: (1) "private rights of action" allowing individual consumers to sue in state or federal court and (2) public enforcement actions brought by state Attorneys General in federal court.  *See* 47 U.S.C. § 227(b)(3), (g)(2); *Mims*, 132 S. Ct. at 745-46.  The statute makes no reference to lawsuits against states or state agencies and does not mention – let alone "unmistakably" override – state sovereign immunity.  *See generally* 47 U.S.C. § 227.  The TCPA's legislative history is also silent on such immunity.  *See id*; *Mims*, 132 S. Ct. at 752 (discussing statements made by Sen. Hollings in the lead-up to the Act's passage, none of which include sovereign immunity).  Thus, without a "clear legislative statement," Keumurian cannot successfully claim that Congress "unequivocally expressed its intent to abrogate the immunity," and her argument would fail the first prong of the *Seminole Tribe* test.

*See Seminole Tribe*, 517 U.S. at 55.  The Commonwealth's sovereign immunity therefore bars Keumurian's claims.[9]

### C. ALTERNATELY, THE TCPA CLAIM MUST BE DISMISSED BECAUSE THE COMPLAINT ALLEGES NO SPECIFIC FACTS AGAINST MBHE AND MBHE IS NOT A "PERSON" UNDER THE TCPA.

In the alternative, this Court should dismiss Keumurian's claim under the Telephone Consumer Protection Act (TCPA) for two reasons.  First, Keumurian's Amended Complaint makes no specific factual allegations against MBHE sufficient to state a claim that MBHE violated the TCPA.  And second, as a state agency, MBHE is not a "person" within the meaning of the TCPA.

### 1. Keumurian's Amended Complaint Fails to State a Claim that MBHE Violated the TCPA.

Keumurian's TCPA claim must be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678.  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."  *Id.* (internal quotations omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.*  (internal quotations omitted).

---

[9] Because Keumurian sued only MBHE, and not its chairperson in his official capacity, the court need not consider whether *Ex Parte Young*'s exception to sovereign immunity for prospective injunctive relief against state officials applies.  *See Ex parte Young*, 209 U.S. 123 (1908); *Green*, 474 U.S. at 68 (noting that the *Ex parte Young* exception permits only "injunctive relief to prevent a continuing violation of federal law"); *Edelman*, 415 U.S. at 677 ("[A] federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief").  Moreover, Keumurian's complaint does not seek such relief.  Compl. ¶ 1 (noting that "[t]his is an action for damages").

19

Yet Keumurian's complaint does precisely that. Her TCPA claim, totaling just seven paragraphs, fails to even mention MBHE by name. *See* Compl. ¶¶ 163-169. Instead, it alleges only that "Defendants" – none specified – called Keumurian by means of an "automated dialing system." *Id.* The complaint does not identify when these calls allegedly occurred, except "during the time relevant to this Complaint." *Id.* ¶ 164. And it concludes only that "[b]ecause Defendants had never received [Keumurian's] permission" to call using an automated dialing system, "Defendants willfully or knowingly violated the TCPA." *Id.* ¶ 168. These allegations are nothing more than "naked assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678, and Keumurian's TCPA claim must therefore be dismissed.

### 2. MBHE is not a "Person" Under the TCPA

This Court should alternatively dismiss Keumurian's TCPA claim because MBHE is not a "person" within the meaning of the statute. The TCPA declares that "[i]t shall be unlawful for any *person* within the United States . . . to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(B) (emphasis added). If a "person" violates this provision, the TCPA creates a private right of action to obtain an injunction and/or damages. *See generally id.* § 227(b)(3); *Int'l Sci. & Tech. Inst., Inc. v. Inacom Commc'ns, Inc.*, 106 F.3d 1146, 1150 (4th Cir. 1997).

But the TCPA's definition of a "person" does not encompass a state agency like MBHE. Indeed, at least one federal court has held that the TCPA does not apply to governmental entities. In *Lambert v. Seminole County School Board*, the U.S. District Court for the Middle District of Florida granted summary judgment for a county school board that was accused of erroneously robo-calling a Florida man. *See* No. 15-0078 (M.D. Fl., Jan. 21, 2016). According to the *Lambert* court, although the TCPA does not define "person," the Communications Act of 1934,

20

which the TCPA amended, does. *Id.* at 4-5. Under the Communications Act, a "person" is "an individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 153(39). Examining this definition, the *Lambert* Court noted that "any mention of governmental entities" was "conspicuously absent," and concluded that governmental entities, like school boards, therefore "fall outside the ambit of the TCPA's cause of action." *Lambert*, No. 15-0078, at 5-8.

This same reasoning applies here. As noted above, MBHE is a governmental entity – an "arm of the state." It is not an "individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 153(39); *see* M.G.L. c. 15A §§ 1, 4; McCurdy Aff. ¶¶ 2-6. As a result, MBHE falls outside the scope of the TCPA's private cause of action, and the claim must be dismissed. Moreover, if the Court dismisses the TCPA claim, Keumurian will be left with claims under two North Carolina debt collection statutes and civil conspiracy – thus, claims only under state, not federal law. If these claims are not dismissed, the result would be "a federal court instruct[ing] state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. And *Pennhurst* makes clear that "[s]uch a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* Accordingly, if the Court dismisses the TCPA claim, it must dismiss the remaining state law claims against MBHE as well.

### III.    <u>CONCLUSION</u>

For the above reasons, the complaint against MBHE should be dismissed with prejudice.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

*/s/ Juliana deHaan Rice*
Juliana deHaan Rice (BBO # 564918)
Andrew J. Haile (BBO# 694182)
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2583
February 24, 2017                Juliana.Rice@state.ma.us

<u>CERTIFICATE OF SERVICE</u>

I certify that this document, filed through the Court's ECF, system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants by first-class mail on February 24, 2017.

*/s/ Juliana deHaan Rice*
Juliana deHaan Rice
Assistant Attorney General